IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JERRY ROBINSON, | : | Case No. 1:18-cv-307 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING DEFENDANT'S** |
| | : | **MOTION FOR SUMMARY** |
| GEORGIA-PACIFIC CORRUGATED, LLC, | : | **JUDGMENT** |
| | : | |
| Defendant. | : | |

Plaintiff Jerry Robinson brings race discrimination and retaliation claims under 42 U.S.C. §§

2000e-2, e-3 and Ohio Rev. Code § 4112 against his former employer, Defendant Georgia-Pacific

Corrugated LLC ("Georgia-Pacific"). Georgia-Pacific has filed a Motion for Summary Judgment

(Doc. 24); Robinson has responded (Doc. 28), and Georgia-Pacific has replied (Doc. 31). The Court

concludes that Robinson has presented genuine issues of material fact that preclude summary

judgment on his claims,[1] which arise from the following, undisputed factual context.[2]

## I.     Background

Georgia-Pacific is one of the nation's leading corrugated (cardboard) box manufacturers. In

2004, it hired Robinson as a general laborer at its West Chester facility. Robinson was promoted to

Third Shift Supervisor in 2015, a salaried position (*see* Thiem Dep., Doc. 20-1 at PageID 301), where

he was employed until his termination. While his promotion, raises, and large parts of his 2017

performance review suggest that Georgia-Pacific generally viewed Robinson favorably throughout his

tenure, hints of discontent surfaced during the approximately two years prior to his termination. In

2015, one of Robinson's direct reports complained of a verbal altercation. In 2017, Georgia-Pacific

investigated a Twitter account, featuring Robinson's name and likeness, which had been spreading

negative comments about the company and certain employees. Robinson denied that it was his

---

[1] After careful review of the parties' briefs, the Court concluded that oral argument, as requested by Robinson, was not
necessary.
[2] The factual background is derived from the agreed upon portions of Georgia-Pacific's Proposed Undisputed Facts (Doc.
24-1) and Plaintiff's response thereto (Doc. 28-1), except as otherwise noted.

account and reached out to other employees to discuss this investigation. The West Chester facility's Director of Operations, Sean Thiem, warned Robinson against attempting to interfere or influence the investigation, though it was ultimately dropped. Robinson's 2017 performance review accordingly did not reference this investigation, but did note communication issues. Finally, a general laborer, Josh Merz, complained to Thiem about an interaction with Robinson that made him uncomfortable. This latter interaction occurred the night before the incident at the heart of this lawsuit.[3]

That incident occurred on May 25, 2017—before Thiem had time to investigate Merz's complaint. According to Georgia-Pacific's account, Merz had taken an extended break (40–50 minutes) to take an important phone call. Upon his return, Robinson asked: "Where the fuck have you been?" After explaining the phone call, Robinson asked: "Why the fuck were you gone for an hour?" Robinson cut off Merz's reply and said: "You know what? I don't even need you. Get the fuck out of here." As Merz turned to leave, Robinson reprimanded him about having tobacco in his mouth and yelled at him to "get the fuck back to work." Merz admitted responding: "Fuck you."

Shortly after the incident, Robinson emailed Thiem his version of events. This emailed version tracks Merz's on the basic contours of the interaction, while omitting profanities and any suggestion of an escalation in the exchange. When telling his side of the story at his deposition (*see* Robinson Dep., Doc. 22-1 at PageID 545–548), Robinson described a mess resulting from Merz's unexpected absence. (*Id.* at 545–46.) When Merz returned, Robinson asked "where the hell you been?" (*Id.* at 546.) Merz's response was incomprehensible; Robinson believed him to be under the influence of some kind of substance and also noticed the chewing tobacco obscuring his words. (*Id.*) Robinson instructed Merz to spit out his chewing tobacco consistent with the company's zero-

---

[3] Robinson denies Merz's complaint for lack of knowledge—i.e., he asserts that he was not made aware of the complaint and contests the factual basis for it. But he does not contest the fact that Thiem received this complaint. (*Cf.* Doc. 20-1 at PageID 302; Ex. 3 to Thiem Decl., Doc. 23-4 at PageID 760.)

tolerance policy. (*Id.* at 548.) According to Robinson, the incident ended with Merz's apology and the two men shaking hands. (*Id.* at 546.)

An internal investigation ensued. Georgia-Pacific asked Merz, and later Robinson, to not report to work during the investigation. In total, Thiem interviewed nine third-shift employees. Thiem also interviewed Robinson with the facility's Human Resources Generalist, Susie Raichle.[4] Four of these employees reported witnessing the incident to some degree: Cordell Byrd, Demba Ndiaye, Ryan Gregory, and John Epperley.[5] (*See* Ex. 5 to Thiem Decl., Doc. 23-6 at PageID 766–67; Ex. 7 to Thiem Decl., Doc. 23-8 at PageID 773; Ex. 8 to Thiem Decl., Doc. 23-9 at PageID 775–780, 783–84.) Byrd's account almost identically tracks Merz's—profanities included. (*See* Doc. 23-9 at PageID 780.) Ndiaye's and Epperley's accounts both cite unprofessional behavior. (*See id.* at PageID 776 ("yelling and screaming"); PageID 778 ("very unprofessional . . . yelling at each other throughout the conversation").) Only Gregory reported no notable confrontation. (*See id.* at PageID 784.) Eight of the nine employees interviewed[6] reported that controversial and heated radio conversations took place during Robinson's third shifts—the consensus being that he participated to a certain extent, did not intervene when things became heated, but also did not curse or escalate conversations. While not characterizing it as pointedly, Gregory (the ninth) reported that non-third-shift employees might not be "used to" the types of conversations that took place during that shift. (*Id.* at PageID 784.) Five of the nine employees interviewed believed that Robinson singled out certain employees with negative treatment.[7] Overall, of the nine interviewees, only Gregory's recollection was similar to Robinson's account of the incident and third-shift radio communications.

---

[4] Since the time of the incident, Susie Raichle married and changed her name. For clarity, the Court refers to her by her maiden name.

[5] Robinson's deposition testimony corroborates this, except that he does not acknowledge Epperley as being present. (*See* Doc. 22-1 at PageID 547–48.) Epperley had been leaving the floor when the incident took place, the noise from which caused him to look back; this would explain Robinson failing to observe him. (*See* Doc. 23-9 at PageID 776.)

[6] Chris Singleton, Byrd, Ndiaye, Robin Dyer (*see* Doc. 23-6 at PageID 765–67), Rick Fleming, Travis Roberson, Epperley (*see* Doc. 23-8 at PageID 773–76), and George McCollough (*see* Ex. 1 to Raichle Decl., Doc. 23-12 at PageID 794).

[7] Singleton, Byrd, Dyer (*see* Doc. 23-6 at PageID 765–766, 768), Fleming (*see* Doc. 23-8 at PageID 771), and Roberson (*see id.* at PageID 774).

3

After the investigation had begun and he was asked not to report to work, but prior to his termination, Robinson lodged complaints to Georgia-Pacific's employee-relations hotline. While the corresponding incident reports themselves do not specifically mention race discrimination or retaliation (*see* Ex. 9 to Thiem Dep., Doc. 23-10 at PageID 787–89), Raichle's deposition testimony suggests that she was aware that Robinson had complained of racial discrimination during the course of the investigation. (Raichle Dep., Doc. 21-1 at PageID 488.) Ultimately, Georgia-Pacific suspended Merz for three days and terminated Robinson. Georgia-Pacific followed Robinson's June 9, 2017 telephonic termination with a letter, which cited the following, specific predicates to his termination:

- engaging in a heated and unprofessional conversation with an hourly employee that involved cursing;
- being aware of and sometimes participating in unprofessional conversations over the radio with his direct reports;
- being untruthful during the investigation.

(*See* Ex. 24 to Thiem Dep., Doc. 20-16 at PageID 481.)

## II.   Standard of review

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (en banc). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248 (citation omitted). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.  Law

Robinson's claims rely on circumstantial evidence. (*See* Doc. 28 at PageID 995.) They are each, therefore, subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Heffernan v. U.S. Bank Nat. Ass'n*, No. 1:13cv001, 2014 WL 3408594, at \*11 (S.D. Ohio July 10, 2014) (discrimination); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (retaliation). Under that framework:

> The burden is first on the plaintiff to demonstrate a prima facie case . . .; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext-i.e. that the employer's explanation was fabricated to conceal an illegal motive.

*Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted).

## A. Racial discrimination

Title VII and Ohio's Civil Rights Act make it unlawful for an employer to terminate an employee on the basis of race. *See* 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02(A).[8] A prima facie case for discrimination requires proof:

> 1) that [the plaintiff] was a member of a protected class; 2) that [the plaintiff] suffered an adverse employment action; 3) that [the plaintiff] was qualified for the position; and 4) that [the plaintiff] was replaced by someone outside of the protected class or was treated less favorably than a similarly situated individual outside [the plaintiff's] protected class.

*Heffernan*, 2014 WL 3408594, at *11 (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009) and *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000)).

Georgia-Pacific challenges only the fourth element, which sets out alternate means of its satisfaction: proof of less favorable treatment than, or replacement by, a member of a non-protected class. First, Georgia-Pacific argues that Robinson has not pointed to similarly-situated employees that were not in a protected class and that were treated differently for similar conduct. Second, it argues that Robinson has not identified his replacement as that term is understood in the context of Title VII. The Court considers the record as it pertains to each alternative, below.

### 1. Less favorable treatment

To establish that a similarly-situated employee in a non-protected class was treated more favorably than he was, Robinson must identify "one or more comparators who are similarly situated in all relevant respects." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2012). The Sixth Circuit has focused on whether a plaintiff and comparator "(1) share the same supervisor; (2) are subject to the same standards; and (3) have engaged in the same conduct 'without such differentiating or mitigating circumstances that would distinguish their conduct or

---

[8] The parties cite all federal law. "The same analysis generally applies to claims under Title VII and the [Ohio Civil Rights Act]." *Arnold v. City of Columbus*, 515 F. App'x 524, 529 (6th Cir. 2013) (citing *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) and *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (1981)).

the employer's treatment of them for it.'" *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480–81 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). "[E]xact correlation" is not necessary, but Robinson and his comparator must be similar "in all relevant respects." *Bobo*, 665 F.3d at 753. Robinson identifies four potential comparators.

### a. Jeff Engle

Jeff Engle, a Caucasian, hourly[9] corrugator lead, was suspended for a pushing and shoving match following a disrespectful radio conversation with another hourly employee. (*See* Georgia-Pacific incident report, Doc. 27-1 at PageID 976.) Engle engaged that same employee in another verbal and physical altercation several months later, for which Georgia-Pacific issued a warning that any further conduct issues would result in his immediate termination. (*Id.* at PageID 985 (referring to a "last chance agreement").) Georgia-Pacific admits that Engle's conduct conceivably could be considered "arguably similar" to that attributed to Robinson. (Doc. 31 at PageID 1034.)

Robinson attempts to bridge any relevant gap between his and Engle's positions by pointing to his own deposition testimony, where he describes his shift supervisor duties as "basically . . . the same as shift lead, just different title" (Doc. 22-1 at PageID 533); though in his surrounding testimony, Robinson notes that his own move from lead to shift supervisor was a "promotion" to a "salary" position. (*Id.*)[10] Wary of putting too much stock in their formal titles, however, the Court looks to the remaining "similarly-situated" factors: whether Robinson and Engle shared the same supervisors and standards. *See Barry*, 276 F. App'x at 480. Considered in a light most favorable to Robinson, the evidence shows that he and Engle were both supervised

---

[9] The parties do not identify this in their briefing, but Thiem confirms it in his deposition. (*See* Thiem Dep., Doc. 20-1 at PageID 309.)

[10] Robinson elsewhere refers to Fleming, also a corrugator lead, as having "worked under" him. (Doc. 28 at PageID 1005.)

by Thiem. (*See* Doc. 20-1 at PageID 309 (Thiem describing his handling the investigation and discipline related to Engle).) It also shows that Robinson and Engle were both subject to Koch Industry's Code of Conduct. (*See id.* at PageID 301–02.) While that document does indicate certain "additional responsibilities" applicable to leaders, the favorable inference to Robinson is that both a shift lead (Engle) and shift supervisor (Robinson) would be considered leaders for purposes of the Code of Conduct. (*See* Ex. 2 to Thiem Dep., Doc. 20-2 at PageID 349.) For purposes of summary judgment, there is a genuine issue of material fact as to whether Robinson and Engle are appropriate comparators.

### b. Jeff Flandemeyer

At his deposition, Robinson testified that Jeff Flandemeyer, a Caucasian, got into a heated argument with another employee, Nick Romito; but he also testified that he "wasn't a witness" to this argument. (Doc. 22-1 at PageID 565–66.) He was simply questioned about it. (*Id.* at 566.) He points to no other evidence of this incident. In Thiem's deposition, he noted a separate altercation involving Flandemeyer, of which he was aware but did not witness, where Flandemeyer had allegedly spoken "inappropriately." (*See* Doc. 20-1 at PageID 308.) Other employees had relayed to him that Flandemeyer "got into it with Mark Whitaker . . . and . . . cussed at him[.]" (*Id.*) Whitaker was a Director of Operations. (*See* Robinson Decl., Doc. 26 at PageID 972.) The record is not entirely clear as to Flandemeyer's position at the time of the alleged incidents. Robinson identifies him as a "shift supervisor." (Doc. 28 at PageID 1006.) Georgia-Pacific promoted him, at some point, to Director of Operations. (See Doc. 20-1 at PageID 308.)

Unlike with Engle, where there is room for rational differences in opinion as to whether he and Robinson are apt comparators, Robinson and Flandemeyer are not similarly situated. Giving Robinson the benefit of the doubt as to whether there was, in fact, a first altercation

between Flandemeyer and Romito, the only document suggesting that the latter was a subordinate is Robinson's unsworn characterization as such in his opposition motion. (*See* Doc. 28 at PageID 1006.) Robinson's sworn, referenced deposition testimony does not state whether Romito was an hourly employee. And even if it had, Robinson's description makes no reference to Flandemeyer using profanities or engaging in inappropriate radio communications. As to the second allegedly similar instance of conduct involving Flandemeyer, the evidence suggests that his conduct did not involve a subordinate, but rather a fellow supervisor or superior.[11] And while the second, corroborated incident included the alleged use of profanities, Thiem mentions no improper radio communication or related oversight problems related to Flandemeyer. This conduct is not sufficiently similar for a legally appropriate comparison.

### c. Sean Thiem and Rick Fleming

Robinson next identifies Sean Thiem as a comparator because he engaged in a "loud and aggressive" argument with an hourly employee. (Doc. 26 at PageID 972.) Although having reported it, Robinson was not asked to write or sign a statement or be interviewed, and Georgia-Pacific neither suspended nor terminated either employee. (*Id.*) Robinson's declaration is the only proffered evidence of this incident. In addition to Thiem occupying a more senior position than Robinson, the incident described lacks any allegations of inappropriate radio communications or related oversight problems.

Finally, Robinson points to Rick Fleming—a Caucasian hourly employee and corrugator lead. (*See* Doc. 20-1 at PageID 301.) In Thiem's deposition, he describes Fleming "calling somebody names"[12] over the radio *without* a raised voice. (*Id.* at PageID 301, 322.) The

---

[11] Whitaker was a Director of Operations until he "moved to take over a different business unit[.]" (Doc. 20-1 at PageID 298.)

[12] A far cry from the profanities alleged against Robinson, Thiem recalled that Fleming had referred to someone as "twinkle toes." (*Id.* at PageID 301.)

severity of the alleged conduct is of an entirely different character from that alleged as to Robinson. Neither Thiem nor Fleming are appropriate comparators.

Robinson's evidence of his and Engle's similarity in position, as it pertains to their job duties, appears limited to his own testimony. But Georgia-Pacific has not otherwise conclusively rebutted Engle as an appropriate comparator. It cites *Moore v. Ohio Edison Co., Inc.*, 4:15-cv-1424, 2016 WL 7097631 (N.D. Ohio Dec. 6, 2016), for the proposition that Robinson's "conclusory" testimony is insufficient to withstand summary judgment. (Doc. 31 at PageID 1032.) But in that case, the plaintiff had offered "no record evidence" on certain of the alleged comparators; and of those whose conduct was evidenced in the record, such conduct was not sufficiently similar to the plaintiff's. *Id.* at *8 & n.10. Here, Robinson has pointed to independent evidence of Engle's conduct and Georgia-Pacific concedes that it approaches the severity of the conduct attributed to Robinson.

The fact that testimony is self-serving does not mean that it is properly disregarded; such testimony alone may be sufficient to defeat summary judgment. *See Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010). Conclusory testimony devoid of any specific facts, by contrast, is not sufficient. *See Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598–99 (6th Cir. 1999). But brief testimony is not tantamount to conclusory testimony. Because Robinson has testified that his and Engle's positions covered similar duties, there is evidence to show that they shared the same supervisor and code of conduct, and because Georgia-Pacific has not specifically contradicted the appropriateness of the comparison, there is a genuine issue of material fact as to whether Engle is an apt comparator.

There is also a genuine issue of material fact as to whether Robinson was treated less favorably than Engle for similar conduct. Robinson cites the Georgia-Pacific incident report that accompanied Engle's second altercation, which reflects a "last chance agreement" as opposed to

"discharge" as the applicable disciplinary action. (Doc. 27-1 at PageID 985.) By contrast, both Thiem and Georgia-Pacific's area operations leader, Jamie West, who oversaw the subject facility and was Thiem's direct report (*see* West Dep., Doc. 25-1 at PageID 837–38; Doc. 20-1 at PageID 298) testified that Georgia-Pacific *did* terminate Engle for his conduct. (*See* Doc. 20-1 at PageID 322–23; Doc. 25-1 at PageID 869–70.) Construing the evidence in favor of Robinson, however, the incident report could be read as an implied contradiction of their testimonies—i.e., that Engle must have engaged in *additional* inappropriate conduct before he was terminated and was therefore treated more favorably.

### 2. Replacement

As an alternate means to satisfy the fourth prima facie element, Robinson argues that he was replaced by a Caucasian supervisor: Rick Fleming. "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Heffernan*, 2014 WL 3408594, at *11 (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) and citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)). By contrast, "a 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.'" *Grosjean*, 349 F.3d at 336 (quoting *Barnes*, 896 F.2d at 1465 (6th Cir. 1990)) (remaining citations omitted).

The entire substance of Robinson's argument on his replacement is the following:

> [Georgia-Pacific] claims that, in the two years since it terminated Robinson, it has not found a new third shift supervisor. Instead, the company has attempted to minimize the role of the person who has assumed Mr. Robinson's duties. According to [Georgia-Pacific], Rick Fleming, a Caucasian Corrugator Lead, is merely "watching the shift." [Georgia-Pacific]'s only justification for not hiring a third shift supervisor is that, in over two years, it has "not found the right person for the job yet." (Doc. 20-1, PgID# 323). But it has found the right person— Fleming, who worked under Robinson, has taken over the job. [Georgia-Pacific] cannot stall an "official" hire for the position until this litigation has concluded to avoid meeting this element. The extended period of time in which the position has

been "vacant" combined with Fleming's occupation of the position creates a genuine issue of fact to be presented to a jury.

(Doc. 28-1 at PageID 1005.) The only evidence cited to support this theory is Thiem's deposition testimony. But the Court's reading of the cited testimony leaves it with a different impression than that advanced by Robinson. The questioning went:

> Q. To your knowledge, has the company filled --
> A. No, we have not.
> Q. -- Ms. [sic] Robinson's position? Who's doing his duties?
> A. Rick Flemming is a corrugator lead. He's watching the shift right now, but he is not a third shift supervisor.
> * * *
> Q. Why hasn't the position been filled?
> A. We just haven't felt like we found the – the right person for the job yet. We had . . . one candidate that we were going to hire but he decided to take an opportunity at PAX Corrugated Products instead.

(Doc. 20-1 at PageID 323.) In addition, attached to Thiem's deposition but not cited by the parties is one of Robinson's interrogatories, which asked Georgia-Pacific to "[i]dentify any and all individuals who have held the position of 3rd Shift Production Lead since Mr. Robinson's employment was terminated." (Ex. 23 to Thiem Dep., Doc. 20-15 at PageID 458.) Georgia-Pacific responded that "it has not filled Plaintiff's position, rather, *other individuals in the department have covered portions of Plaintiff's duties* since his termination from employment with [Georgia-Pacific]." (*Id.* (emphasis added).)

This is the sole evidence before the Court relative to Robinson's replacement. Considered according to the parameters discussed in *Barnes* and *Grosjean*, the evidence is insufficient to raise a genuine issue of material fact that Fleming is Robinson's *de facto* replacement. If anything, the evidence shows that multiple employees absorbed Robinson's duties (*see* Doc. 20-15 at PageID 458) and that Fleming watched the third shift—not as its supervisor—*while maintaining his position as corrugator lead* (*see* Doc. 20-1 at PageID 323). Robinson has not cited authority for his insinuation that leaving a position unfilled, coupled with

other employees covering duties, creates a genuine issue of material fact as to his replacement. Robinson's discrimination claim will not be permitted to proceed under this theory.

### 3. Pretext

Having made the prima facie case for discrimination as to less favorable treatment, the burden shifts to Georgia-Pacific to put forth a legitimate and nondiscriminatory reason for Robinson's termination—a non-onerous burden. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion[.]"). Georgia-Pacific has met this burden with, among other ample evidence, its termination letter to Robinson (*see* Doc. 20-16 at PageID 481); Robinson does not argue otherwise. *See Moore*, 2016 WL 7097631, at *9 ("[T]he decision to terminate plaintiff, following an internal investigation, based upon plaintiff's violation of the workplace violence policy, his poor performance, and his work record . . . easily satisfies defendant's burden of production[.]").

The burden, at this point, shifts back to Robinson to demonstrate that Georgia-Pacific's reasons were a pretext for racial discrimination. *Chen*, 580 F.3d at 400. To do so, a plaintiff will generally demonstrate that the employer's stated reason for its action either "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Heffernan*, 2014 WL 3408594, at *12 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)). But this three-pronged analysis should not be applied so rigidly as to miss the point; the bottom-line inquiry is whether "the employer fire[d] the employee for the stated reason or not[.]" *Id.* (quoting *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 285 (6th Cir. 2012)).[13] On summary judgment, Robinson must provide "sufficient evidence from which a jury

---

[13] Both parties cite *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006), in which Judge Posner criticized the third prong of this pretext analysis:

> If the stated reason for the challenged action did not motivate the action, then it was indeed pretextual. If it was *insufficient* to motivate the action, either this means that it didn't motivate it, or that it shouldn't have motivated it. If the first is the intended sense, the dictum is just a murky way of saying that the

could reasonably reject [Georgia-Pacific's] explanation of why it fired [him]." *Chen*, 580 F.3d at 400 (citation omitted).

Robinson begins with the factual basis for Georgia-Pacific's stated reasons—focusing on its third (untruthfulness). He contends that the record shows that he *was* truthful during the investigation of the incident. In support, he points to the accounts of other employees that he believes support his version of events. But among the employee accounts of the incident at issue and about third shift radio communications generally; eight of the nine accounts broadly corroborate Georgia-Pacific's version of events. Only Ryan Gregory's is remarkably different. Three of the four employees that actually witnessed the altercation (Gregory being the fourth) reported profanities (*see* Doc. 23-9 at PageID 780), a "very unprofessional" conversation with "yelling" (*id.* at PageID 778), and "yelling and screaming" (*id.* at 776). Eight of the nine employees interviewed reported that third shift radio communications were controversial, heated, or unprofessional. (*See* Doc. 23-6 at PageID 765–67; Doc. 23-8 at PageID 773–76; Doc. 23-12 at PageID 794.) Even Gregory (the ninth), while hesitating to characterize them as such, admitted that non-third-shift regulars might not be "used to" the conversations that took place during that shift. (Doc. 23-9 at PageID 784.)

But even if Robinson's version of the incident and third-shift radio communications *are* true, it does not necessarily follow that Georgia-Pacific's stated reasons for his termination were pretextual. Under the "honest belief" rule employed in the Sixth Circuit,

> as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately

> stated reason was not the real reason. If the second sense is the one intended, then the dictum is wrong because the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason.

*Forrester*, 453 F.3d at 417–18. While not convinced to abandon this third prong, the Sixth Circuit has taken this criticism seriously. *See Chen*, 580 F.3d at 400 n.4. Whether viewed through the lens of Georgia-Pacific's reasons not motivating or not *sufficiently* motivating Robinson's termination, the end goal is to identify whether there is sufficient evidence for a jury to reasonably suspect that Georgia-Pacific "made up its stated reason to conceal intentional discrimination." *Id.*

found to be mistaken. . . . But to prove that the offered, non-discriminatory basis for the employment action is "honestly held," "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." [*Smith v. Chrysler Corp.*, 155 F.3d 799, 807.] Once the employer shows that it "made a reasonably informed and considered decision before taking an adverse employment action," "the employee has the opportunity to produce proof to the contrary." *Id.*

*Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895–96 (6th Cir. 2016). A "reasonably informed and considered decision" does "not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807.[14] Given the slant of the evidence in Georgia-Pacific's favor, any error in their determination was certainly not "too obvious to be unintentional" such that it might demonstrate an "unlawful motive." *Id.* (quoting *Fischbach v. D.C. Dept. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). Robinson has not put forth evidence that Georgia-Pacific's decision—even if mistaken—was based on anything less than an honest belief.

In addition, Robinson does not attempt to refute Georgia-Pacific's specific contention that his story was *internally* inconsistent. And this contention is supported by the record. Robinson met with Thiem and Raichle on June 1, 2017. Their contemporaneous notes of this meeting record that Robinson flatly denied that the incident was heated, that he cursed, or that radio conversations waded into controversial topics during his shift. (*See* Ex. 6 to Thiem Decl., Doc. 23-7 at PageID 769; Doc. 23-12 at PageID 795.) Yet both noted that Robinson acknowledged, *in this same meeting*, that he needed to "cool off" after the incident. (*See id.*) In a follow-up conversation on June 8, 2017, Robinson continued to deny that the incident was heated—but ended up admitting the contrary. (*See* Doc. 23-12 at PageID 796 ("Don't get me wrong, the situation was a hot situation[.]").)

---

[14] In a few places throughout his memorandum in opposition, Robinson alludes to irregularities in the investigation; though he never explicitly charges that the investigation would not pass muster under the "honest belief" rule. Even if he had made that argument, the Court would not be convinced. For example, Robinson complains that Thiem's investigation "went far beyond" the human resources directive, which was to question employees about the incident at issue. (Doc. 28 at PageID 999.) But this ignores the testimony just before the portion quoted to support this proposition, where Thiem states: "I was instructed by HR [to talk to employees] because of the allegation that [Merz] had brought up about being harassed." (Doc. 20-1 at PageID 305.) Merz's complaint was independent of and received just prior to the incident at issue. An investigation of that complaint, in addition to the incident at issue, naturally would warrant broader questioning.

Robinson next argues that the stated reasons, even if true, were not the actual reasons for his termination. He argues that the evidence supporting his prima facie case for race discrimination—that a comparator was treated more favorably—can establish pretext. He cites *Heidel v. Ohio Dept. of Pub. Safety-Ohio State Highway Patrol,* No. 1:12-cv-298, 2013 WL 5876153, at *9 (S.D. Ohio Oct. 20, 2013); and *Hodges v. City of Milford,* 918 F. Supp. 2d 721, 740 (S.D. Ohio 2013) as authority. In *Heidel,* the Court identified five, highway-trooper comparators to the female, highway-trooper plaintiff. 2013 WL 5876153 at *6–9. In *Hodges,* the court identified only one apt comparator. 918 F. Supp. 2d at 739.

The Court concludes that any issue with the factual basis for Georgia-Pacific's stated reasons was rooted in its honest belief. The only question, then, is whether Robinson has put forth sufficient evidence such that a reasonable jury could find that these reasons were not the *actual* reasons for his termination. Robinson points solely to his prima facie case that comparators were treated more favorably despite similar conduct.

While this is far from the strongest case that the Court can imagine, it is not satisfied that "no rational factfinder could conclude that the action was discriminatory." *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 461 (quoting *Reeves,* 530 U.S. at 148). In addition to his prima facie case, the Court notes some inconsistency as to whether Georgia-Pacific uniformly applied "progressive discipline" to Robinson and Engle. (*See* Doc. 20-1 at PageID 309–10.) Thiem testified that he "didn't have any . . . documentation" about prior incidents involving Robinson supporting his termination; though he recalled that a lack of "strong enough documentation" prevented Engle from being terminated after his first altercation. (Doc. 20-1 at PageID 309.) Also, Robinson's generally positive 2017 performance review (*see* Doc. 23-3), compared with the fact that Engle "had been in other incidents before" (*see* Doc. 20-1 at PageID 309) could allow a reasonable inference that something else actually motivated his termination. *Cf. Jackson*

*v. VHS Detroit Receiving Hosp. Inc.*, 814 F.3d 769, 785 (6th Cir. 2016) ("[A] jury could draw the opposite inference from this fact: if [the plaintiff] was an exemplary employee, [the employer] should have given [the plaintiff] the same second chance that it provided to her less-than-exemplary male coworkers."). For purposes of summary judgment, Robinson need only "rebut, but not disprove," Georgia-Pacific's stated reasons for his termination. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533 (6th Cir. 2007), *overruled on other grounds, Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).

In sum, the Court will deny summary judgment on the race discrimination claim, but only to the extent that Robinson has alleged less favorable treatment using Engle as a comparator. Robinson's replacement theory gives way under the summary judgment standard.

## B. Retaliation

Under Title VII's anti-retaliation provision, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made [unlawful by Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Like his discrimination claim, Robinson's case for retaliation is circumstantial and therefore subject to the *McDonnell Douglas* burden-shifting framework. *See Imwalle*, 515 F.3d at 544.

Robinson must first make the prima facie case that "(1) he engaged in a protected activity under Title VII; (2) [Georgia-Pacific] knew it; (3) [Georgia-Pacific] thereafter took an adverse employment action against him; and (4) there was a causal connection between the adverse employment action and [his] protected activity." *Fierst v. Ohio Attorney Gen.'s Office*, No. 1:15-cv-00649, 2017 WL 1740117, at *9 (S.D. Ohio May 4, 2017) (citing *Hunter v. Sec'y of United States Army*, 565 F.3d 986, 995–96 (6th Cir. 2009)). A prima facie case for retaliation is "not

onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted).

Georgia-Pacific challenges Robinson's prima facie case on the first and fourth prongs. First, it argues that Robinson's hotline complaints "lacked any allegation of race discrimination or retaliation prior to his termination[.]" (Doc. 24 at PageID 816.) This contention is based on the lack of such allegation in the associated incident reports. (*See* Doc. 23-10 at PageID 787–88.) It ignores, however, both Robinson's testimony that he had complained (pre-termination) that he was "being treated unfairly because of the color of [his] skin" (*see* Doc. 22-1 at PageID 554) and Raichle's testimony, in which she recalled that Robinson had filed a racial discrimination complaint prior to his termination (*see* Doc. 21-1 at PageID 488). Robinson has demonstrated a genuine issue of material fact on the first retaliation prong.

The fourth prong presents a much closer call. Robinson's only alleged evidence of causal connection is the temporal proximity between his hotline complaints and his termination. Robinson is correct that temporal proximity may, in some cases, be enough to satisfy the prima facie case of retaliation if the adverse employment action is "very close in time after an employer learns of a protected activity[.]" *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Here, the temporal proximity is a matter of days. But *Montell* also acknowledged that a per se rule in this context could spawn abuse: "[E]mployees who are about to be fired should not abuse the civil-rights protections by filing frivolous harassment complaints." *Id.* at 507. To temper such concerns, while maintaining unfettered access to civil-rights protections, the Sixth Circuit set forth the following roadmap: "'[an employer] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality,'... but where an employer deviates from those lines, temporal proximity can certainly be evidence of causality." *Id.* (quoting *Clark Cnty.*

*Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). The heart of this inquiry is "what made [the employer] fire [the employee] *when it did*." *Id.* (quoting *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009)).

The incident at issue occurred on May 25, 2017. After receiving Robinson's email about the incident and getting Merz's account on May 26, 2017, Thiem alerted Raichle and began further investigation—additional employee interviews beginning that same day. (*See* Thiem Dec., Doc. 23-1 at PageID 752–53.) Georgia-Pacific had both begun its investigation of the incident (May 26, 2017) and asked Robinson to stop reporting to work (June 2, 2017) (*see* Ex. 4 to Raichle Dep., Doc. 21-4 at PageID 520) before Robinson made his first hotline complaint (June 5, 2017) (*see* Doc. 23-10 at PageID 787). In total, the investigation proceeded for approximately two weeks before Georgia-Pacific terminated Robinson.

In addition to this timeline, the Court considers additional context to the investigation. The parties have not pointed to evidence demonstrating that Georgia-Pacific began its investigation with termination in mind—even as a remote possibility. Robinson's most recent review, while indicating room for improvement, neither included nor alluded to a risk of termination. (*See* Doc. 23-3.) After Robinson was told not to report to work during the investigation, Raichle reported telling him that this was not a suspension, but instead was simply Georgia-Pacific's "process for when we must conduct investigations." (*See* Ex. 2 to Raichle Decl., Doc. 23-13.) After a meeting with Thiem, Raichle, and West the day prior to his termination, Robinson recalled being walked to his car and reassured by West. (*See* Doc. 22-1 at PageID 554.)

In light of this evidence and the timeline above, the Court is tasked with determining whether Robinson's termination was, definitively, the natural result of Georgia-Pacific "proceeding along lines previously contemplated, though not yet definitively determined[.]"

*Breeden*, 532 U.S. at 272. The quoted phrase is susceptible to further parsing. For example, what, exactly, need have been previously contemplated in order to insulate an employer from liability—investigation, discipline, termination? The answer is not entirely clear, though the Sixth Circuit has provided some guidance. In *Adamov v. U.S. Bank Nat'l Ass'n*, 681 F. App'x 473 (6th Cir. 2017), the court considered a retaliation claim preceded by complaints of national-origin discrimination. *Id.* at 474. The plaintiff had been hired as an assistant bank manager and was promoted based on a generally positive initial tenure—though not free from incident. *Id.* at 475. Following an investigation of his business and personal financial transactions, the plaintiff complained of national-origin discrimination. *Id.* at 475–76. Approximately a month later, the bank terminated him. *Id.* at 476. The Court concluded that the temporal proximity between his complaint and termination was sufficient, alone, to establish causation for the prima facie retaliation case. *Id.* at 478. In doing so, it reasoned:

> [T]here is no evidence that U.S. Bank "previously contemplated" terminating [the plaintiff.] First, Burk did not recommend and Hartnack did not decide to terminate [the plaintiff] until after [the plaintiff] complained of discrimination. . . . It is true that the anti-money laundering department launched an investigation into [the plaintiff] before [the plaintiff] complained. But, as the dissent points out, these investigations appear to be "routine," . . . and unrelated to punishment, let alone termination.

*Id.* at 478 n.5.

While Georgia-Pacific's investigation was related to punishment in a broad sense, their human resources department was also employing its routine investigatory process. (*See* Doc. 23-13.) There is no evidence in the record to suggest that this investigation began with an eye toward termination. *Compare Reynolds v. Federal Exp. Corp.*, 544 F. App'x 611, 615 (6th Cir. 2013) ("[T]his is not one of those distinct cases [where temporary proximity permits an inference of retaliation] because Smith *undisputedly contemplated firing* the plaintiffs" prior to the protected activity) (emphasis added); and *McClusky v. Lake Hosp. Sys.*, No. 1:14-CV-519, 2015

WL 2451727, at *5 (N.D. Ohio May 21, 2015) (summary judgment for employer on retaliation claim not appropriate where a human resources consultation specifically related to termination occurred only after the protected conduct; and where the plaintiff did not know that he was effectively terminated until after he engaged in the protected conduct); *with Thompson v. Fed. Express*, No. 13-14296, 2015 WL 3915777, at *7 (E.D. Mich. June 25, 2015) (employer "proceeded along lines previously contemplated" in terminating the plaintiff where the plaintiff's protected conduct was predated by a disciplinary investigation and her suspension pending the outcome). While *Thompson* first strikes the reader as on point, it is different in one important respect: the plaintiff's manager therein had specifically witnessed her offending conduct. *See id.* The incident was also videotaped. *Id.* at *4. That termination, specifically, might have been "previously contemplated" under those circumstances is more plausible than under the circumstances at bar.

In sum, whether Robinson has put forth sufficient evidence that his protected activity was causally connected to his termination is a close call. As such, the Court "is constrained to err on the side of avoiding any factual determinations on summary judgment" and concludes that Robinson has demonstrated genuine issues of material fact on its prima facie retaliation case. *Broad v. North Pointe Ins. Co.*, No. 5:11CV2422, 2014 WL 1097925, at *8 (N.D. Ohio Mar. 19, 2014); *see also Bentley v. Highlands Hosp. Corp.*, No. 15-97-ART, 2016 WL 7234757, at *1 (E.D. Ky. Dec. 13, 2016) ("In summary judgment, ties go to the plaintiff. . . . Because civil litigants have a right to a jury trial."). As to the remaining steps of the *McDonnell-Douglas* analysis, the adverse employment action and Georgia-Pacific's proffered legitimate explanations therefore are the same here as with the racial discrimination claim. Therefore, for the reasons discussed in Part III.A.3, summary judgment for Georgia-Pacific on the retaliation claim is likewise inappropriate on pretext grounds.

## IV. Conclusion

If the Court were weighing evidence, Georgia-Pacific wins. But it is not, and Robinson's evidence is not so legally insufficient that the factfinder should be denied that opportunity. Georgia-Pacific's Motion for Summary Judgment is **DENIED**. As explained herein, Robinson's discrimination claim is limited to the less-favorable-treatment theory using Engle as a comparator.

**IT IS SO ORDERED.**

Dated: Jan 29, 2020

Judge Susan J. Dlott
United States District Court